# In the United States Court of Federal Claims

No. 18-1081L
(Filed:  February 8, 2019)

*************************************

| | |
|---|---|
| WHITELAND HOLDINGS, L.P. and<br>FRAZER/EXTON DEVELOPMENT,<br>L.P.,<br><br>               Plaintiffs,<br><br>    v.<br><br>THE UNITED STATES,<br><br>               Defendant. | RCFC 12(b)(1); Takings Clause of the<br>Fifth Amendment; Environmental<br>Contamination; 28 U.S.C. § 2501; Statute<br>of Limitations; Claim Accrual;<br>Stabilization Doctrine; Justifiable<br>Uncertainty |

*************************************

Matthew D. McDonald, Tallahassee, FL, for plaintiffs.

Brent H. Allen, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

      In this case, plaintiffs Whiteland Holdings, L.P. ("Whiteland") and Frazer/Exton Development, L.P. ("Frazer/Exton") contend that defendant's operations and methods of disposal on property now owned by Whiteland contaminated the property's soil and groundwater, effecting a taking by inverse condemnation without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution.  Defendant moves to dismiss the amended complaint for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") and, alternatively, for failure to state a claim upon which this court can grant relief pursuant to RCFC 12(b)(6).  As explained below, Whiteland and Frazer/Exton filed suit in this court more than six years after their Takings Clause claim accrued.  Therefore, the court grants defendant's motion and dismisses the amended complaint without prejudice for lack of subject-matter jurisdiction.

# I. BACKGROUND

The subject property is located at 15 South Bacton Hill Road in Frazer, Chester County, Pennsylvania, and is situated primarily in East Whiteland Township.[1]  Am. Compl. ¶ 2; Def.'s Mot. Dismiss & Mem. Supp. ("Mot.") Ex. 1 at 3-4.[2]  Foote Mineral Company ("Foote Mineral") originally acquired the subject property in 1941.[3]  Mot. Ex. 1 at 4.  The federal government purchased the subject property in 1942 through the Defense Corporation of America, and "engaged [Foote Mineral] to conduct lithium chemical processing operations for the government."  Id.; accord Mot. Ex. 6 at 5.  The federal government also utilized the subject property "for the production of various lithium and munition products as well as the stockpiling and storage of exotic ores."  Am. Compl. ¶ 6.

Foote Mineral reacquired the subject property in July 1946, after the conclusion of World War II.  Id. ¶ 8; Mot. Ex. 1 at 4.  Until sometime during the 1950s, defendant continued to operate the site, engaging Foote Mineral to produce and manufacture "lithium halides and lithium metal products, both in liquid and solid form," to "ground a variety of minerals and alloys," to produce "inorganic fluxes for the steel industry," and to store "various exotic ores for ammunition production and other potential uses as part of the wartime effort."  Am. Compl. ¶¶ 9-10.  Site operations "created large quantities of hazardous substances" that "were disposed of in limestone quarries" on the subject property.  United States v. Frazer Exton Dev. LP, No. 07-2666, 2008 WL 2876570, at *1 (E.D. Pa. July 24, 2008).  "These substances contaminated soil on the Site and the ground water beneath the Site, causing a plume of contamination that extends approximately two miles east" of the subject property.  Id.  Foote Mineral ceased its disposal practices in or around 1975.  Mot. Ex. 2 at 5.

After Foote Mineral "engaged in cleanup and monitoring efforts" throughout the 1970s and 1980s, the United States Environmental Protection Agency ("EPA") "became involved in remediation efforts in 1988."  Frazer Exton, 2008 WL 2876570, at *1.  A November 8, 1988 EPA site inspection of the subject property, and an environmental assessment of the subject property by Foote Mineral earlier that year, revealed high levels of lithium, chromium, and lead in the sediments and surface water of the south quarry.  Mot. Ex. 1 at 5.  On June 29, 1990, the EPA and Foote Mineral entered into a consent order that required Foote Mineral to "conduct a

---

[1]  The facts in this section derive from the complaint, the parties' submissions (including attached exhibits), and matters of which the court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence.  See Rocky Mountain Helium, LLC v. United States, 841 F.3d 1320, 1325-26 (Fed. Cir. 2016).  Unless otherwise stated, the facts are undisputed for purposes of resolving defendant's motion to dismiss.

[2]  The exhibits attached to defendant's motion to dismiss contain excerpts of documents.  The court therefore references the page numbers affixed by the court's electronic case filing system.

[3]  All references in this opinion to Foote Mineral also refer to any then-existing successor in interest of Foote Mineral.

groundwater survey, institute a five-year monitoring program of private drinking water supplies, and provide an alternative drinking water source to affected residents."  Frazer Exton, 2008 WL 2876570, at *1.  Foote Mineral discontinued site operations in 1991.  Id.; Mot. Ex. 1 at 3.  On October 14, 1992, the EPA added the subject property to the General Superfund Section of the National Priorities List.[4]  National Priorities List for Uncontrolled Hazardous Waste Sites, 57 Fed. Reg. at 47,183-84.  The subject property became known as the "Foote Mineral Superfund Site."  See, e.g., Mot. Ex. 6 at 2.  In September 1996, the EPA, pursuant to a second consent order, required Foote Mineral to "conduct a remedial investigation and feasibility study."  Frazer Exton, 2008 WL 2876570, at *1.

On October 1, 1998, Frazer/Exton entered into an agreement to acquire the Foote Mineral Superfund Site.  Am. Compl. ¶ 14; Mot. Ex. 4 at 2.  In conjunction with its acquisition of the site, Frazer/Exton was to receive $3 million from Foote Mineral, Mot. Ex. 4 at 5, and assume

> all liabilities, obligations, and/or responsibilities under any
> applicable Environmental Law for Environmental Conditions,
> other than Excluded Liabilities,[5] including without limitation:
>
> (i)    all liabilities, obligations and responsibilities
>
> > (A)    to implement any [Record of Decision] or other
> > decision document issued by any governmental
> > authority for the Property;
> >
> > (B)    to perform the Response Actions[;] and
> >
> > (C)    otherwise in connection with the Consent Order;
> > and
>
> (ii)    all claims by the EPA or the Commonwealth of
> Pennsylvania for the recovery or reimbursement of
> response costs incurred on or after the Closing Date with
> respect to the Property and Environmental Conditions.

Id. at 2 (footnote added).  As part of the agreement, Frazer/Exton acknowledged that it would not

---

[4]  "The identification of a site for the [National Priorities List] is intended primarily to guide EPA in determining which sites warrant further investigation and to assess the nature and extent of the public health and environmental risks associated with the site . . . .  The [National Priorities List] also serves to notify the public of sites that EPA believes warrant further investigation."  National Priorities List for Uncontrolled Hazardous Waste Sites, 57 Fed. Reg. 47,180, 47,182-83 (Oct. 14, 1992).

[5]  The "excluded liabilities" are not at issue here.  See Mot. Ex. 4 at 3 (defining the "excluded liabilities").

be entitled to receive any compensation from Foote Mineral "for changes in the anticipated scope of the Response Actions, including without limitation, changes that are the result of unknown or undiscovered Environmental Conditions or modifications in Environmental Laws." Id. at 5. Frazer/Exton consummated its acquisition of the subject property on November 20, 1998, with "full knowledge of the existing contamination of the Site." Frazer Exton, 2008 WL 2876570, at *1.

In June 2001, Frazer/Exton completed a Remedial Investigation Report and a Feasibility Study Report. Mot. Ex. 3 at 3. On August 11, 2003, the EPA held a public hearing regarding its proposed plan for the Foote Mineral Superfund Site. Mot. Ex. 6 at 2. At that meeting, the EPA's regional remedial project manager described the history of the site. Id. at 5-6. He indicated that the site "was added to the Superfund list primarily because of lithium that was discovered in groundwater leaving the site" and that "numerous investigations have been run to determine the type and extent of contamination on and around the site." Id. at 6. He explained that in November 2001, when the EPA was "very close" to holding a public hearing regarding the site, bromate was discovered in the groundwater. Id. at 7. Frazer/Exton's president was at that public hearing, acknowledged that Frazer/Exton owned the site, and stated that (1) Frazer/Exton was "wholly supportive of the [EPA's] proposed remedy and the proposed plan" and (2) the company "look[ed] forward to an expeditious negotiation of the implementation of the remedy with the EPA." Id. at 8.

The EPA issued a Record of Decision—selecting a permanent remedy for the Foote Mineral Superfund Site—on March 31, 2006, and notified Foote Mineral and Frazer/Exton "of their potential liability to remedy the site" pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). Frazer Exton, 2008 WL 2876570, at *1. Frazer/Exton "volunteered to perform the work required by the [Record of Decision]" on July 21, 2006. Id. Frazer/Exton and the EPA then entered into a proposed consent decree "for the purpose of commencing the design phase of the remedial action contemplated by the [Record of Decision]" that provided for Frazer/Exton to "pay the interim and future costs contemplated by the consent decree" and "pay for and perform the remedial action that was selected by the EPA in the [Record of Decision]." Id. at *1-2. Specifically, the Record of Decision required:

1) removal of the waste and contaminated soil from the site;

2) steps such as placing clean fill on the Site and capping the quarries to prevent the contamination of groundwater;

3) long-term monitoring of the groundwater;

4) institutional controls to prevent residential use of impacted groundwater and the capped quarry areas; and

> 5)  review of the progress of the remedy at least once every five
>     years to ensure that the remedy continues to be protective of
>     public health and the environment.

Id. at *2.

　　While conducting the remediation work, Frazer/Exton "learned that the volume of contaminated soil [was] larger than was estimated in the [Record of Decision]." Id. at *2; accord Mot. Ex. 2 at 6.  On April 7, 2008—after a thirty-day public comment period and an EPA public availability session regarding the additional contamination—the EPA signed an Explanation of Significant Differences.  Frazer Exton, 2008 WL 2876570, at *2.

> The [Explanation of Significant Differences] amends the [Record
> of Decision] by expanding the area to be capped, revising clean-up
> standards for certain contaminants, and allowing the use of
> permeability barriers in areas where the depth of the contaminated
> soil is such that the volume is too large to fit into the expanded
> capped areas.

Id. (internal quotation marks omitted).  Following a public comment period regarding the proposed consent decree, the United States District Court for the Eastern District of Pennsylvania held a public hearing.  Id. at *3.  On July 24, 2008, the court approved and entered the consent decree, finding that it was "procedurally and substantively fair" and "reasonable and consistent with CERCLA's goal of ensur[ing] the cleanup of the nation's hazardous waste sites."  Id. (internal quotation marks omitted).

　　As part of the consent decree, Frazer/Exton entered into the following covenants, among others:

> 89.  Covenant Not to Sue.  Subject to the reservations in
>      Paragraph 90, [Frazer/Exton] hereby covenants not to sue and
>      agree[s] not to assert any claims or causes of action against
>      the United States with respect to the Site, Past and Future
>      Response Costs as defined herein, or this Consent Decree,
>      including, but not limited to:
>
>      a.  any direct or indirect claim for reimbursement from
>          the Hazardous Substance Superfund . . . ;
>
>      b.  any claims against the United States, including any
>          department, agency or instrumentality of the United
>          States under CERCLA sections 107 or 113 related to
>          the Site; or

      c.   any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the [Pennsylvania] Constitution, the Tucker Act . . . , the Equal Access to Justice Act . . . , or at common law.

90.   [Frazer/Exton] reserves, and this Consent Decree is without prejudice to, claims against the United States subject to the provisions of [28 U.S.C. §§ 2671-2680] for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  . . .

Mot. Ex. 3 at 6-7.

On October 28, 2010, the EPA issued a Superfund Preliminary Close Out Report pertaining to the Foote Mineral Superfund Site.  Pls.' Mem. Opp'n Def.'s Mot. Dismiss ("Opp'n") Ex. 2 at 3.  According to Frazer/Exton, it "completed the investigation, removal, and/or remediation of the Site in 2011."  Mot. Ex. 2 at 6.  Thereafter, Frazer/Exton "continue[d] to incur additional costs in monitoring and reporting requirements."  Id.  On August 30, 2013, Frazer/Exton filed suit against Foote Mineral and its successors, seeking to recover the costs it had incurred "in implementing the Site investigations and removal and/or remediation actions" and "costs related to continued monitoring and reporting."  Id.  The case eventually settled.  Stip. Dismiss With Prejudice, Frazer/Exton Dev., L.P. v. Rockwood Holdings, Inc., No. 2:13-cv-05110-CDJ (E.D. Pa. Nov. 8, 2016).  Whiteland acquired the subject property via sheriff's sale on November 17, 2016.  Am. Compl. ¶¶ 15-16; Opp'n Ex. 1 ¶ 7.  On September 11, 2017, pursuant to Pennsylvania law, Whiteland executed an Environmental Covenant in favor of Frazer/Exton.  Am. Compl. ¶ 16; see also Opp'n Ex. 2 (providing a complete copy of the Environmental Covenant).  The EPA approved the Environmental Covenant nine days later. Am. Compl. ¶ 16; Opp'n Ex. 2 at 8.  As relevant here, the Environmental Covenant contains sections describing the history of the contamination and cleanup efforts pertaining to the Foote Mineral Superfund Site, see Opp'n Ex. 2 at 3-4, and "activity and use limitations[] which the then current owner of the Property, and its tenants, agents, employees and other persons under its control, shall abide by," id. at 4.  Frazer/Exton then procured an appraisal to "determine[] the full extent of the loss of value due to the Environmental Covenant executed as a result of the presence of contamination in the soils and groundwater at the Site."  Opp'n Ex. 1 ¶ 5.

Frazer/Exton filed suit in this court on July 24, 2018, alleging generally that (1) defendant's actions "contaminated the soils on-Site as well as groundwater within and around the Site," Compl. ¶ 12, (2) such contamination "has invaded and caused permanent and irreparable damage" to the Foote Mineral Superfund Site, id. ¶ 14, and (3) "the full consequences

of the Defendant's actions have not been fully manifested," id. ¶ 15.  Frazer/Exton amended its complaint on August 24, 2018, repeating the same allegations but adding Whiteland as an additional plaintiff.[6]  Compare Am. Compl. ¶¶ 13-18, with Compl. ¶¶ 12-15.

Defendant subsequently moved to dismiss the amended complaint.  Briefing on defendant's motion is now complete.  The parties did not request oral argument, and the court deems it unnecessary.  Defendant's motion is therefore ripe for adjudication.

## II. DISCUSSION

Frazer/Exton and Whiteland allege that "Defendant's actions amount to an inverse condemnation" in violation of the Takings Clause.  Am. Compl. ¶ 20.  Specifically, they assert that "[t]he contamination on Plaintiffs' property was the direct, natural, or probable result of Defendant's operation of the site," id. ¶ 22 (emphasis added); "Defendant knew, or should have known, and it was foreseeable, that Defendant's operations and methods of disposal at the Site would likely result in discharges of multiple hazardous substances to the soils and groundwater at and around the Site," id. ¶ 23 (emphasis added); and "Defendant's disposal and discharge of various contaminants at the Site has appropriated a benefit to Defendant at the expense of Plaintiffs, which has prevented and will continue to prevent Plaintiffs from enjoying their property for an extended period of time in that the contamination will remain on the Site for the foreseeable future," id. ¶ 24 (emphasis added).  Defendant contends that the "Plaintiffs' takings claim accrued far more than six years before Frazer/Exton filed suit," Mot. 10, that "Frazer/Exton has waived" any Takings Clause claim against the federal government with respect to the Foote Mineral Superfund Site, id. at 9, and that both Frazer/Exton and Whiteland lack standing because "neither Frazer/Exton nor Whiteland held any sort of property interest in the Foote Mineral Superfund Site at the time of the [alleged] taking," id. at 12.

### A.  Standard of Review Under RCFC 12(b)(1)

The court first addresses the arguments that defendant raises pursuant to RCFC 12(b)(1).  In determining whether subject-matter jurisdiction exists, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  With respect to a motion to dismiss for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, that the court possesses subject-matter jurisdiction.  Id.  If jurisdictional facts are challenged, the court is not limited to the pleadings in determining whether it possesses subject-matter jurisdiction to entertain a plaintiff's claims.  Banks v. United States, 741 F.3d 1268, 1277 (Fed.

---

[6]  In its original complaint, Frazer/Exton alleged that it owned the Foote Mineral Superfund Site.  Compl. ¶ 13.  In their amended complaint, Frazer/Exton and Whiteland allege that Whiteland "is the current owner," Am. Compl. ¶ 15, but that Frazer/Exton "maintains a property interest," id. ¶ 14, in the site.  Frazer/Exton relies on the September 11, 2017 Environmental Covenant and Pennsylvania law to establish its current property interest in the site.  Opp'n Ex. 1 ¶ 8.

Cir. 2014); <u>Pucciariello v. United States</u>, 116 Fed. Cl. 390, 400 (2014).  If the court finds that it lacks subject-matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

## B.  Subject-Matter Jurisdiction

Whether the court possesses subject-matter jurisdiction to decide the merits of a case is a "threshold matter."  <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94-95 (1998).  Subject-matter jurisdiction cannot be waived or forfeited because it "involves a court's power to hear a case."  <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 514 (2006) (quoting <u>United States v. Cotton</u>, 535 U.S. 625, 630 (2002)).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  <u>Ex parte McCardle</u>, 74 U.S. (7 Wall) 506, 514 (1868).  Therefore, it is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case."  <u>Matthews v. United States</u>, 72 Fed. Cl. 274, 278 (2006); <u>accord</u> <u>Hymas v. United States</u>, 810 F.3d 1312, 1316-17 (Fed. Cir. 2016) ("[A] federal court [must] satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." (alterations in original) (quoting <u>Ruhrgas AG v. Marathon Oil Co.</u>, 526 U.S. 574, 583 (1999))).  Either party, or the court <u>sua sponte</u>, may challenge the court's subject-matter jurisdiction at any time.  <u>Arbaugh</u>, 546 U.S. at 506; <u>see also</u> <u>Jeun v. United States</u>, 128 Fed. Cl. 203, 209-10 (2016) (collecting cases).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  <u>United States v. Sherwood</u>, 312 U.S. 584, 586 (1941).  The waiver of immunity "may not be inferred, but must be unequivocally expressed."  <u>United States v. White Mountain Apache Tribe</u>, 537 U.S. 465, 472 (2003).  Further, "[w]hen waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity."  <u>Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands</u>, 461 U.S. 273, 287 (1983).

The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2012); <u>White Mountain</u>, 537 U.S. at 472.  However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages."  <u>United States v. Testan</u>, 424 U.S. 392, 398 (1976).  The Tucker Act simply "confers jurisdiction . . . whenever the substantive right exists."  <u>Id.</u>  The substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States."  <u>Loveladies Harbor, Inc. v. United States</u>, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

In addition, to fall within the court's jurisdiction, any claim against the United States filed in the Court of Federal Claims must be "filed within six years after such claim first accrues." 28 U.S.C. § 2501. A cause of action accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." San Carlos Apache Tribe v. United States, 639 F.3d 1346, 1350 (Fed. Cir. 2011) (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988)). The limitations period set forth in 28 U.S.C. § 2501 is an "absolute" limit on the ability of the Court of Federal Claims to exercise jurisdiction and reach the merits of a claim. John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133-35 (2008). Although equitable tolling of the six-year statute of limitations in the Court of Federal Claims is not available, claim accrual is suspended "until the claimant knew or should have known that the claim existed." Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (internal quotation marks omitted). To successfully invoke the accrual suspension rule, a plaintiff must demonstrate that either (1) the government "concealed its acts" or (2) the plaintiff's injury was "inherently unknowable." Id. (internal quotation marks omitted). The "knew or should have known" test for claim accrual is "used interchangeably" with the "concealed or inherently unknowable" test, although the latter is "both more common and more precise." Ingrum v. United States, 560 F.3d 1311, 1315 n.1 (Fed. Cir. 2009).

## C. Analysis

The only claim raised in the amended complaint is a Fifth Amendment taking arising from defendant's inverse condemnation of the subject property. The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction" in the Court of Federal Claims. Jan's Helicopter Serv., Inc. v. FAA, 525 F.3d 1299, 1309 (Fed. Cir. 2008); accord Mildenberger v. United States, 643 F.3d 938, 944-45 (Fed. Cir. 2011) ("When the Government takes property but fails to compensate the owner, the Tucker Act provides jurisdiction to enforce the owner's compensatory right."). The parties do not dispute that Frazer/Exton and Whiteland have alleged a Takings Clause claim. Rather, the central issue is determining when Frazer/Exton and Whiteland's Takings Clause claim accrued.

Pursuant to the facts alleged by Frazer/Exton and Whiteland, the purported taking due to defendant's actions occurred not at a discrete moment in time, but through the gradual contamination of the Foote Mineral Superfund Site. Accrual of a takings claim effected by a "gradual physical process" occurs "when the situation has 'stabilized.'" Banks v. United States, 314 F.3d 1304, 1308 (Fed. Cir. 2003). The stabilization doctrine is a manifestation of the accrual suspension rule. "[S]tabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." Boling v. United States, 220 F.3d 1365, 1370-71 (Fed. Cir. 2000). "[J]ustifiable uncertainty about the permanency of the taking" thus prevents accrual of a takings claim. Id. at 1372. In other words, the claim accrues when the "permanent nature of the taking is evident." Id. at 1371; see also Mildenberger, 643 F.3d at 944-46 (discussing the development and application of the stabilization doctrine).

Defendant asserts that "[b]y the time [Frazer/Exton] acquired the Foote Mineral Superfund Site in 1998, [it] was well aware of the history of government actions at the Site, and the extent of contamination at the Site," and notes that "in 2003, Frazer/Exton's president even participated in a public meeting where an EPA representative discussed the government's actions at the Site." Mot. 10. Defendant further remarks that "Frazer/Exton cannot credibly claim that any alleged contamination is ongoing" and observes that "Frazer/Exton itself has repeatedly asserted that <u>remediation</u> of any contamination at the Site was complete by 2011." <u>Id.</u> at 11. In response, Frazer/Exton and Whiteland aver that "the earliest time by which accrual could be measured, thus triggering the six-year statute of limitations period, would be the date the invasion stabilized so that [Frazer/Exton and Whiteland] could fully take account of their damages due to the consequences of Defendant's actions" and that their damages "would have been merely speculative and not quantifiable or present until the [September 11, 2017] Environmental Covenant was executed." Opp'n 3.

Frazer/Exton and Whiteland are correct that, although all operations at the Foote Mineral Superfund Site concluded in 1991, they "may postpone filing suit until the nature and extent of the taking is clear." <u>Id.</u> at 11 (quoting <u>Fallini v. United States</u>, 381 F.3d 1378, 1381 (Fed. Cir. 1995)). However, their argument misses the mark. The stabilization doctrine "does not permit a claimant to delay bringing suit until any possibility of further damage has been removed." <u>Mildenberger</u>, 643 F.3d at 946. Rather, the doctrine provides that "claimants are not required to sue when it is still uncertain whether the gradual process will result in a permanent taking." <u>Id.</u> Frazer/Exton and Whiteland fail to recognize that the "nature and extent of the taking" refers to the taking's permanency (or lack thereof), not the taking's damages quantum.

Assuming (without deciding) that Frazer/Exton and Whiteland could not quantify "the full consequences of the damages" until the "imposition of the [September 11, 2017] Environmental Covenant . . . allowed a final account to be struck," Opp'n 11-12, that lack of knowledge is not dispositive. Ignorance of a claim that a plaintiff "should have been aware of is not enough to suspend the accrual of a claim." <u>Ingrum</u>, 560 F.3d at 1314-15. Frazer/Exton and Whiteland's Takings Clause claim accrued when they "knew or should have known [that] the alleged contamination by the United States," Mot. 12, effected a permanent taking, not when they became aware of the full extent of the damage. See <u>Boling</u>, 220 F.3d at 1371 ("[T]he proposition that the filing of a lawsuit can be postponed until the full extent of the damage is known has been soundly rejected.").

Construing the complaint in the light most favorable to Frazer/Exton and Whiteland, their argument that their "harm did not exist until the loss of use and property value could be determined as a result of the Environmental Covenant," Opp'n 12, invokes the "inherently unknowable" prong of the accrual suspension rule. The "inherently unknowable" test involves a "reasonableness inquiry." <u>Holmes v. United States</u>, 657 F.3d 1303, 1320 (Fed. Cir. 2011); <u>accord Japanese War Notes Claimants Ass'n of Philippines, Inc. v. United States</u>, 178 Ct. Cl. 630, 634 (1967) ("[T]he statute will not begin to run until plaintiff learns or reasonably should have learned of [its] cause of action."). Thus, the court must determine whether Frazer/Exton and Whiteland's alleged ignorance of their claim prior to September 11, 2017, when the Environmental Covenant was executed, was reasonable.

As noted above, the Environmental Covenant contains a description of the contamination and remediating of the Foote Mineral Superfund Site.  Opp'n Ex. 2 at 3-4.  That description refers to the following public events:

- October 14, 1992—subject property listed as a Superfund site in the Federal Register,

- March 30, 2006—EPA issues a Record of Decision selecting a remedy for the Foote Mineral Superfund Site,

- July 25, 2008—United States District Court for the Eastern District of Pennsylvania enters the consent decree that "requires [Frazer/Exton] to finance and perform the remedial design and remedial action at the site," and

- October 28, 2010—EPA issues a Superfund Preliminary Close Out Report regarding the Foote Mineral Superfund Site.

Id. at 3.  The description also included a notation that the "administrative record pertaining to the [Record of Decision] is located at" the EPA office in Philadelphia, Pennsylvania as well as the Chester County Library in Exton, Pennsylvania.  Id. at 4.  In addition to being actually known by Frazer/Exton, these are all public events, and accordingly are "by definition knowable."  Central Pines Land Co. v. United States, 61 Fed. Cl. 527, 534 (2004); accord id. ("A party will be charged with knowing any facts that are discoverable in public records, and ignorance of one's legal rights arising from those facts is not a sufficient excuse to justify tolling the statute of limitations.").  Further, there is no indication or suggestion that the federal government "intentionally conceal[ed] its actions from [Frazer/Exton and Whiteland]" such that they were "unaware that a claim exist[ed]," id. at 535, following the October 28, 2010 close out report.  Indeed, Frazer/Exton was aware of the presence of bromate in the groundwater by 2003 at the latest, and the extended scope of the contamination prior to entry of the consent decree in 2008.  Finally—and most importantly—Frazer/Exton itself has averred that it completed the required remediation in 2011.

Accrual suspension will not be available "where a claimant could have asserted a claim if it had sought advice, launched an inquiry, or otherwise taken steps to discover available information."  Id. at 534.  Thus, Frazer/Exton and Whiteland could not delay the accrual of their claim by delaying their investigation (here, by executing the Environmental Covenant containing land use restrictions that allegedly reduced the value of their property) when they had access to all of the necessary facts—by virtue of those facts being in the public record, as well as Frazer/Exton's actual knowledge of those facts—giving rise to their claim.  If litigants were able to so delay, the six-year statute of limitations set forth in 28 U.S.C. § 2501 would be superfluous.

The holding of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") in Banks—that the plaintiffs' claims were reasonably uncertain until after particular reports were issued, 314 F.3d at 1310—does not compel a finding for Frazer/Exton and

Whiteland in the instant case.  In <u>Banks</u>, the plaintiffs contended that the construction and maintenance of jetties by the United States Army Corps of Engineers ("Corps") damaged a lakebed, thereby effecting a taking of the plaintiffs' property without just compensation.  <u>Id.</u> at 1305-06.  At issue was whether the Corps's mitigation efforts to combat the erosion caused by the jetties prevented the plaintiffs' claims from accruing.  <u>Id.</u> at 1307-08.  The Federal Circuit determined that because the mitigation efforts undertaken by the Corps "appeared to successfully stave off the damaging effects of the jetties . . . , the accrual of plaintiffs' claims remained uncertain until [reports issued by the Corps] collectively indicated that erosion was permanent and irreversible," and thus the statute of limitations did not begin to run until the reports were issued.  <u>Id.</u> at 1310.  In the instant case, the necessary information that "collectively indicated" the extent of the contamination on the Foote Mineral Superfund Site were all available to Frazer/Exton and Whiteland no later than 2011, when remediation was completed.  Frazer/Exton and Whiteland therefore had access, by 2011, to all of the information necessary to determine the permanent nature of the alleged taking.

Nor does <u>Mildenberger</u> compel a finding for Frazer/Exton and Whiteland.  In <u>Mildenberger</u>, the plaintiffs alleged that the Corps's repeated discharge of waters from a lake effected a taking of their riparian rights along the river into which the released water flowed. 643 F.3d at 942-43.  The plaintiffs argued that their uncertainty regarding the permanent nature of the consequences of the Corps's actions was justifiable because the Corps had made "numerous efforts and even more promises to mitigate the damage" caused by the discharges. <u>Id.</u> at 947 (internal quotation marks omitted).  The Federal Circuit rejected that argument, explaining that there was "no justifiable uncertainty . . . because the Corps neither undertook nor committed itself to any mitigation activities," and distinguished the case from <u>Banks</u>, in which the Corps had actually undertaken mitigation efforts.  <u>Id.</u>  Here, because Frazer/Exton completed the remediation in late 2011, there could have been no uncertainty surrounding the permanency of the alleged taking after that point.

While "determining the exact point of claim accrual is difficult" when, as here, a gradual physical process is involved, <u>id.</u> at 945, the court need not determine the specific date on which Frazer/Exton and Whiteland were reasonably aware of the permanent nature of the alleged taking.  Without having to identify the precise date, Frazer/Exton and Whiteland clearly had such knowledge by no later than 2011, when Frazer/Exton completed the required remediation.  Since the original complaint was filed more than six years later, the Court of Federal Claims lacks jurisdiction to entertain this case.[7]

---

[7]  Because the court lacks jurisdiction to entertain this case, it need not address defendant's arguments concerning standing and waiver.

## III.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or unnecessary for resolving the issues currently before the court.

For the aforementioned reasons, the court **GRANTS** defendant's motion to dismiss.  The amended complaint is **DISMISSED WITHOUT PREJUDICE** in its entirety for lack of subject-matter jurisdiction.  No costs.  The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge
